IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VITO J. PARISE, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15 CV 1995 |
| v. ) | |
| ) | |
| INTEGRATED SHIPPING SOLUTIONS, INC., ) | Judge Joan H. Lefkow |
| a Wisconsin Corporation; DERRICK OLSON, an ) | |
| individual; and BRETT STUBBLEFIELD, an ) | |
| individual, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

After being fired from his job, Vito J. Parise filed suit against his former employer, Integrated Shipping Solutions, Inc. (ISS), its president Derrick Olson, and its vice president Brett Stubblefield (dkt. 1), alleging breach of employment contract (count one), failure to pay final compensation under the Illinois Wage Payment and Collection Act (IWPCA) (count two), retaliatory discharge under the IWPCA (count three), and tortious interference with employment contract (count four).[1] Defendants have moved for summary judgment on all claims. (Dkt. 71.)[2] For the reasons stated below, the motion is granted in part and denied in part.

---

[1] The court's jurisdiction rests on 28 U.S.C. § 1332. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391.

[2] Counts 5 (age discrimination under the Age Discrimination in Employment Act) and 6 (age discrimination under the Illinois Human Rights Act) were dismissed at Parise's request on November 1, 2016.

# BACKGROUND[3]

This is a contract and labor dispute stemming from the termination of Parise's employment. When the undisputed facts are considered, the following narrative emerges.

ISS is a Wisconsin corporation that provides logistics solutions to facilitate the shipping and moving of a variety of products. Olson and Stubblefield co-own ISS and serve as its president and vice president, respectively. In July 2013, defendants learned of a business plan Parise had developed, a managed services model referred to as "Strategic Transportation Management" (STM). STM provides an integrated approach to shipping logistics across the financial, technological, and operational departments within a company, making use of the same carrier for inbound and outbound shipments.

After several meetings, defendants offered Parise a job, formalized in an employment agreement executed on August 20, 2013. Under the agreement, ISS would employ Parise as its Chief Strategy Officer (CSO) for five years at a salary of $235,000 for the first year, with an increase to $250,000 the second year. In order to meet Parise's $235,000 salary requirement, Olson and Stubblefield each took a 50% pay cut, leaving their combined salaries approximately equal to Parise's individual salary and making Parise the highest paid employee of ISS. The

---

[3] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements, and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

agreement also included a "Termination for Cause" provision containing a "satisfaction clause."[4] The satisfaction clause allowed ISS "at any time [to] terminate [Parise] for 'cause,' which shall include . . . failure to perform the duties of [Parise's] position in a satisfactory manner . . . ." (Dkt. 78, at 18 (first alteration added).) After executing the employment agreement, ISS leased an office in Rolling Meadows, Illinois, where Parise and several other ISS employees worked.[5]

Over the course of the next year, Parise and defendants worked to find clients to implement the STM model. For example, Parise entered into negotiations with McCain Foods on the subject, though the negotiations were ultimately fruitless. Parise also worked on a partial, manual implementation of STM with an existing ISS customer, Northern Safety & Industrial, starting in November 2013. Emails sent by Parise between December 2013 and April 2014 illustrate his continued belief in the project, stating that he was personally working to generate revenue, which was forthcoming.

Throughout this period, Olson and Stubblefield encouraged employees, including Parise, to work on generating revenue. In an August 2013 email, Olson set a $1 million booked-fees goal for Parise and three other employees, assigning each the goal of $250,000 in revenue by the end of 2013. In January 2014, Olson instituted a sales competition and held individual meetings with employees, including Parise, to discuss ways to increase revenue. In May 2014, ISS hired a logistics executive to evaluate multiple ISS employees, including Parise, and work with them on ways to generate revenue. And in June 2014, Olson and Stubblefield discussed, between themselves, the possibility of restructuring Parise's employment agreement.

---

[4] The agreement also includes language regarding severance if Parise's employment terminated before the fifth year. While Parise's general entitlement to severance is at issue for summary judgment purposes, the specific language of those clauses is not.

[5] Soon after Parise's termination, ISS cancelled its lease on the Rolling Meadows office.

3

Despite his enthusiasm (and increasing pressure by Olson and Stubblefield), Parise had not generated any revenue by the end of his first year. On August 28, 2014, Parise sent Stubblefield an email noting that the agreed-to raise had not gone into effect as scheduled on August 16 and asking that the missing increase be included in his September paycheck. Stubblefield forwarded Parise's email to Olson, and subsequent emails between the two indicate that they were disappointed that Parise had brought up the agreed-to raise. Stubblefield acknowledged that Parise was contractually entitled to the raise; nevertheless, both Olson and Stubblefield believed Parise's request was in "poor taste." (Dkt. 82 ¶¶ 18–19.) Later that evening, Olson sent an email to his business mentor Hillary Harris, expressing his disappointment and anger over Parise's request. In that email he asked Harris, "Do you think I am wrong for wanting to terminate my relationship with [Parise] when all he really did is ask for what the employment agreement stated he was 'owed'? It feels like [m]uch more than that." (*Id.* ¶ 22.)

By September 3, 2014, Stubblefield and Olson had decided to fire Parise. That same day Olson sent an email to Harris discussing his plan to fire Parise the following day. On September 4, 2014, Parise went to the ISS Wisconsin office to meet with Olson and Stubblefield on other business. Instead, Olson gave him an official termination letter drafted by ISS's attorney. At the same time, Stubblefield gave Parise a document titled "STM Spin-Off Company Framework" in which ISS proposed to continue its relationship with Parise, but on an independent contractor basis. Parise rejected the proposal and this lawsuit ensued.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

### I. Breach of Employment Contract (Count I)

The parties agree that ISS had the right to terminate Parise for the "failure to perform the duties of [Parise's] position in a satisfactory manner." (Dkt. 78, at 18 (alteration in original).) Under Illinois law, satisfaction clauses in contracts, including employment contracts, are enforceable. *See Chen* v. *Quark Biotech, Inc.*, No. 03 C 5729, 2004 WL 1368797, at *3 (N.D. Ill. June 17, 2004); *see also Beasley* v. *St. Mary's Hospital of Centralia*, 558 N.E.2d 677, 682, 200 Ill. App. 3d 1024, 146 Ill. Dec. 714 (Ill. App. 1990); *Kohler* v. *Leslie Hindman, Inc.*,

5

80 F.3d 1181, 1186–87 (7th Cir. 1996). Further, Illinois courts have developed rules for interpreting such clauses.

> [S]atisfaction clauses in Illinois come in two categories: those that make the exercise of discretion purely subjective and those that require the exercise of discretion according to objective factors. The first category includes satisfaction clauses invoking the feelings, taste or judgment of the party exercising discretion. When a satisfaction clause conveys this sort of subjective discretion, it does not, however, remove all limitations on the exercise of discretion. The party that has the right to act according to its personal judgment or within its sole discretion must still act in good faith.
>
> On the other hand, a satisfaction clause may fall into the second category when it involves matters susceptible to objective evaluation; mechanical utility is a stereotype of such matters. When objective considerations control the exercise of discretion, the party to be satisfied must exercise its authority in a just and reasonable way.

*Kohler*, 80 F.3d at 1186–87 (internal citations omitted).

Employment contracts, like other personal service contracts, often fall into the first category using the subjective standard. *See Beasley*, 558 N.E.2d at 682. Additionally, the satisfaction clause here does not contain any objective criteria. (Dkt. 78, at 18.) Thus, ISS's exercise of its discretion as to what is "satisfactory" is bounded only by the requirement that it act in good faith.

Defendants argue that Parise was terminated because he "failed to generate a single dollar in over a year working at ISS" (dkt. 72 at 14) and refused to follow defendants' suggestions for generating revenue. Parise disputes this and asserts that defendants never raised any complaints about his performance during his tenure at ISS. He argues that defendants terminated him because they were offended by his request for the salary increase, which he supports in part by pointing to the emails discussing Olson's and Stubblefield's disappointment with the salary increase request. Parise argues that termination for this reason did not constitute good faith. (Dkt. 77 at 8.)

6

Viewing the undisputed facts in the light most favorable to Parise, a reasonable jury could find that defendants did not act in accordance with their duty of good faith in terminating Parise's employment. Genuine factual disputes exist as to Olsen and Stubblefield's belief that Parise was not performing to their satisfaction, their expectation of when the STM business plan would start to bring in revenue, and whether Parise was fired because he made a lawful request to enforce the employment agreement between him and ISS. All of these facts would bear on whether ISS acted in good faith.

Defendants' motion for summary judgment on count I is denied.

## II. Applicability of the IWPCA to ISS's Activities (Counts II and III)

Counts II and III allege violations of the IWPCA. Defendants raise a common challenge to both, namely, that ISS is not an Illinois employer for purposes of the IWPCA. The purpose of the IWPCA is to provide Illinois employees with a cause of action for the timely and complete payment of earned wages for final compensation. *Majmudar* v. *House of Spices (India), Inc.*, 1 N.E.3d 1207, 1210 (Ill. App. Ct. 2013) (internal citation omitted). The IWPCA provides enhanced civil damages that are not available under common law for a prevailing employee. 820 Ill. Comp. Stat. § 115/14(a).

The IWPCA "applies to all employers and employees in this State." 820 Ill. Comp. Stat. § 115/1. The Illinois legislature has not defined the term "employer . . . in this State," but Illinois courts have held that the IWPCA does not apply to employers located out-of-state. *See Glass* v. *Kemper Corp.*, 920 F. Supp. 928, 931 (N.D. Ill. 1996), *aff'd*, 133 F.3d 999 (7th Cir. 1998) ("[T]he Wage Act applies to a group consisting of employers and employees, all of whom are in Illinois"); *see also Khan* v. *Van Remmen, Inc.*, 756 N.E.2d 902, 913 (Ill. App. Ct. 2001) ("[A]n Illinois resident does not have a cause of action against an out-of-state employer under the Wage

7

Act."); *DeGeer* v. *Gillis*, 707 F.Supp.2d 784, 800 (N.D. Ill. 2010) (the IWPCA does not apply to out-of-state employers). Illinois courts have, however, "left open the possibility that a corporation with no headquarters or physical presence in Illinois can still qualify as an 'employer' under the [IWPCA]." *Elsener* v. *Brown*, 996 N.E.2d 84, 99, 2013 IL App (2d) 120209, 374 Ill. Dec. 637 (Ill. Ct. App. 2013). Thus, some courts have allowed IWPCA claims against employers that are organized and headquartered in a different state when there are "allegations of substantial in-state activity." *Duberville* v. *WMG, Inc.*, No. 13 C 2061, 2015 WL 186834 at *5 (N.D. Ill. Jan. 13, 2015) ("Courts that have allowed IWPCA claims to proceed have typically required 'allegations of substantial in-state activity' to find that an employer based in another state qualifies as an Illinois employer."); *see also Nathan* v. *Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *17 (N.D. Ill. May 22, 2012) ("Absent allegations of substantial in-state activity, however, courts have declined to subject an out-of-state employer to the demands of the [I]WPCA."); *Musso* v. *Excellence in Motivation, Inc.*, No. 10 C 3236, 2010 WL 3385452, at *2 (N.D. Ill. Aug. 24, 2010); *McGreal* v. *Semke*, 836 F. Supp. 2d 735, 740–41 (N.D. Ill. 2011). Parise argues that ISS had a substantial presence in Illinois during his employment sufficient to create liability under the IWPCA.[6]

---

[6] Parise additionally argues that defendants conceded their liability under the IWPCA when, in May 2015, they tendered him a check to make up for discrepancies in his final paycheck. It included an additional 2% interest payment, which is the statutory damages amount codified in section 115/14(a) of the IWPCA. Parise points to no pertinent authority to support his argument that this constitutes an admission by ISS; therefore, the court does not consider it. *See Smith* v. *Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that undeveloped argument constitutes waiver); *Tyler* v. *Runyon*, 70 F.3d 458, 464 (7th Cir. 1995) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."); *see also Otto* v. *Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments); *United States* v. *Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (stating that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived).

In determining what constitutes "substantial in-state activity," courts have considered whether the employer maintains an office in Illinois that is not temporary or provided solely for the benefit of the plaintiff; markets its services in the state; conducts substantial business activities in the state; is licensed to do business in the state; has a registered agent or bank accounts in the state; or sells products or has projects in the state. *See Nathan*, 2012 WL 1886440, at *18; *McGreal*, 836 F. Supp. 2d at 740–41; *Musso*, 2010 WL 3385452, at *1; *Lovelady* v. *Lyris, Inc.*, No. 13 C 4065, 2013 WL 5967522, *6 (N.D. Ill. Nov. 7, 2013); *Duberville*, 2015 WL 186834, at *6.

Defendants highlight that ISS is not registered to do business in Illinois, does not have a registered agent or bank accounts in the state, and only maintained an office in Illinois for the duration of Parise's employment. (Dkt. 72, at 14–15.) In response, Parise points to evidence in the record that he argues establishes substantial in-state activity by defendants. (Dkt. 77, at 12–13, citing dkt. 79 ¶ 31.[7]) In particular, he notes that the Rolling Meadows office was maintained for the benefit of multiple employees, including Olson and Stubblefield, who would use the office when they were in town; that defendants sought a "Chicago presence" and actively marketed to potential clients in Chicago, including making presentations to Illinois-based companies and entertaining potential clients in Illinois; and, finally, that defendants did business with the Illinois-based employee of a third-party resource for the sales side of their business. Viewing the undisputed facts in the light most favorable Parise, there is a triable issue of fact

---

[7] Defendants' attempt to dispute paragraph 31 of Plaintiff's Statement of Additional Facts (*see* dkt. 82 ¶ 31) but failed to include citations to admissible evidence in the record as required by Local Rule 56.1(b)(3)(B). As such, the factual statements in paragraph 31 are deemed admitted for purposes of summary judgment.

about whether defendants engaged in substantial in-state activity sufficient to render them subject to liability under the IWPCA.[8]

Therefore, summary judgment is inappropriate on the issue of whether defendants are subject to liability under the IWPCA.

### III. Failure to Pay Final Compensation under the IWPCA (Count II)

Section 115/14(a) of the IWPCA states that "[a]ny employee not timely paid . . . final compensation[9] . . . as required by this Act shall be entitled to recover . . . in a civil action . . . the amount of any such underpayments and damages of 2% of the amount of any such underpayments . . . ." Parise alleges that defendants failed to pay him final compensation due under the parties' agreement, including severance and other amounts omitted from his final paycheck, in violation of the IWPCA. (Dkt. 1 at 4–5.) Defendants argue that Parise's claim is moot because he is not entitled to severance and they have already paid him for discrepancies in his final paycheck. (Dkt. 77 at 12–14.)

Defendants do not dispute that they have not made a severance payment to Parise. Instead, in footnote 7 of their opening summary judgment brief, they claim Parise was not entitled to severance. (Dkt. 72, at 15.) Despite stating that they will do so, defendants make no argument "elsewhere in their brief" about why Parise was not entitled to severance. (Dkt. 72, at 15.) The court infers that defendants' argument is that no severance is due to Parise because he was terminated for cause. Because the issue of whether Parise's termination was for cause under

---

[8] The parties do not address, and the court has not found case law clearly holding, whether this is a question of law for the court or a question of fact for the jury. Because there are genuine factual disputes regarding the level of in-state activity by ISS, the court finds that there are factual issues that would be more appropriately decided by a jury.

[9] "Final compensation" is defined by the IWPCA to include "any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 Ill. Comp. Stat. § 115/2.

the agreement is still in dispute, however, the question of whether Parise is entitled to severance is, likewise, still in dispute and must be decided by the trier of fact. Defendants' motion for summary judgment on count II as to the severance claim is therefore denied.

Regarding the issue of discrepancies in Parise's final paycheck, Parise does not dispute that he received two checks in May 2015 to remedy those discrepancies. The court therefore finds count II moot to the extent it requests relief for discrepancies in Parise's final paycheck that are unrelated to severance, and summary judgment is granted on this specific issue.

### III.   Retaliatory Discharge under the IWPCA (Count III)

Count III is a statutory claim of retaliatory discharge. Section 115/14(c) of the IWPCA mandates that

> Any employer, or any agent of an employer, who discharges or in any other manner discriminates against any employee because that employee has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act . . . is guilty, upon conviction, of a Class C misdemeanor. An employee who has been unlawfully retaliated against shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, all legal and equitable relief as may be appropriate. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

820 Ill. Comp. Stat. § 115/14(c).

In order to establish retaliatory discharge, Parise must show that (1) he was discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy. *See Tullis* v. *Townley Engineering & Mfg. Co., Inc.*, 243 F.3d 1058, 1062 (7th Cir. 2001); *Michael* v. *Precision Alliance Group, LLC*, 21 N.E.3d 1183, 1188, 2014 IL 117376, 387 Ill. Dec. 12 (2014). Defendants challenge only whether Parise has pointed to evidence of a causal connection.

Defendants claim that they were dissatisfied with Parise's work because he failed to generate any revenue as well as failed to follow guidance to generate revenue, and these factors

11

led to his termination. (Dkt. 72, at 17.) Quoting liberally from *Precision Alliance*, they argue that, because they have provided a "valid nonpretextual basis for discharging" Parise, Parise has failed to establish the elements of retaliatory discharge. (*Id.* at 16–17.) *Precision Alliance*, however, makes clear that an employer's "valid nonpretextual reason" will defeat liability only if "*the trier of fact believes it.*" *Precision Alliance*, 21 N.E.3d at 1189 (emphasis in original). Parise has pointed to evidence in the record, including the email Olsen sent to his mentor acknowledging Parise was entitled to the salary increase pursuant to their written agreement and that he felt hurt by Parise's request, (dkt. 77, at 11), from which a reasonable jury could conclude that Parise's request was the reason for his termination. Because this material fact is in genuine dispute, summary judgment is inappropriate. Defendants' motion for summary judgment on count III is denied.

## IV. Tortious Interference with Employment Contract (Count IV)

To bear his burden of proving tortious interference with contract,[10] Parise must establish: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) defendants' awareness of this contractual relation; (3) defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendants' wrongful conduct; and (5) damages. *See Koehler* v. *Packer Grp., Inc.*, 53 N.E.3d 218, 237, 403 Ill. Dec. 164 (Ill. App. 2016). Olson and Stubblefield argue that they are entitled to immunity because they are corporate officers. (Dkt. 81 at 11.) "In Illinois, corporate officers are

---

[10] Parise's complaint labels this claim as "Tortious Interference with Employment Expectancy." (Dkt. 1 at 7.) In the paragraphs describing the factual allegations he believes establish the claim, however, Parise instead lays out the elements of tortious interference with contract. (*Id.* ¶¶ 37–40.) Because the parties agree that there was a valid and enforceable contract and Parise provided sufficient notice to defendants in his factual allegations that this was a claim for interference with a contract, the court will evaluate the record under that standard. (Dkt. 78 at 18.) The court notes, however, that the outcome would be the same under the standard for tortious interference with employment expectancy, which is quite similar to the standard above.

12

privileged to influence the actions of their corporations if they act 'for a proper business purpose and in good faith.'" *Dallis* v. *Don Cunningham & Assocs.*, 11 F.3d 713, 717 (7th Cir. 1993) (quoting *Mittelman* v. *Witous*, 552 N.E.2d 973, 987, 135 Ill. 2d 220, 142 Ill. Dec. 232 (1989)). This privilege is by no means absolute. "The privilege which protects corporate officers from tortious interference with the contracts to which their corporations are a party 'does not apply where officers act solely for their own gain or solely for the purpose of harming plaintiff.'" *PRT, Inc.* v. *Forsyth Racing, Inc.*, No. 8 C 5517, 2009 WL 1606970, *3 (N.D. Ill. June 9, 2009) (quoting *Mittelman*, 552 N.E.2d at 983).

As discussed above, genuine disputes of material fact exist as to the reason for Parise's termination, including whether it was retaliation for asserting his right to the raise, which is not a proper business purpose. Moreover, Parise has pointed to evidence in the record that Olson and Stubblefield stood to personally gain financially from his termination, as they had previously taken 50 percent pay cuts in order to pay his salary, a reason that could be inconsistent with a proper business purpose of ISS. Thus, taken in the light most favorable to Parise, a reasonable jury could conclude from the evidence in the record that Olson or Stubblefield, or both, were not motivated by a proper business purpose and did not act in good faith. Olson and Stubblefield respond that, because they have testified that Parise was terminated for failure to generate revenue, no reasonable jury could conclude that they terminated Parise's employment *solely* for personal gain or from a desire to harm him. This argument is unavailing, because a reasonable jury could conclude that Olson and Stubblefield are not credible and reject their testimony.[11] It is

---

[11] Furthermore, typically, a plaintiff in a retaliation claim need not prove that the reason for termination was the sole reason. Rather, he must prove that it was the "but for" reason. *See Univ. of Texas SW Med. Ctr.* v. *Nassar*, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). In other words, would Parise have been fired had he not asked for a raise but everything else had been the same?

not the place of the court to weigh the evidence at the summary judgment stage. The issue of why Parise was terminated, including whether there was a single motivating factor or many, is a question of fact for the jury to decide. Defendants' motion for summary judgment on count IV is denied.

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 71) is granted as to count II to the extent Parise seeks relief for discrepancies in his final paycheck; and denied as to count I, count II to the extent Parise seeks relief regarding severance payment, count III and count IV.

Date: November 13, 2017

_____
U.S. District Judge Joan H. Lefkow